# In the United States Court of Federal Claims

Nos. 20-529 & 22-771 (Consolidated)
(Filed: December 19, 2025)
(Reissued: January 6, 2026)[1]

* * * * * * * * * * * * * * * * * * * * * * *

NSTAR ELECTRIC COMPANY,

        *Plaintiff*,

v.

THE UNITED STATES,

        *Defendant*,

and

HOLTEC PILGRIM, LLC,

        *Defendant-Intervenor*.

* * * * * * * * * * * * * * * * * * * * * * *

HOLTEC PILGRIM, LLC,

        *Plaintiff*,

v.

THE UNITED STATES,

        *Defendant*.

* * * * * * * * * * * * * * * * * * * * * * *

---

[1] This opinion was initially filed under seal to afford the parties an opportunity to propose appropriate redactions. They did not propose any redactions. This opinion thus appears in full.

*Richard J. Conway*, Washington, D.C., for plaintiff, NSTAR Electric Company.

*Adam Kent Israel*, Birmingham, AL, for intervenor defendant, Holtec Pilgrim, LLC.

*Evan Wisser*, Senior Trial Attorney, United States Department of Justice, Civil Division, Commercial Litigation Branch, Washington, D.C., for defendant, the United States, with whom were *Brett A Shumate*, Acting Assistant Attorney General, *Patricia M. McCarthy*, Director, *Lisa L. Donahue*, Assistant Director, and *Brighton Springer*, Department of Energy, of counsel.

<u>OPINION</u>[2]

BRUGGINK, *Senior Judge*.

Pending are the government's and Holtec Pilgrim, LLC's ("Holtec") motions for summary judgment against plaintiff, NSTAR Electric Company ("NSTAR"), and NSTAR's cross-motion for summary judgment. This case centers on the Pilgrim nuclear power plant in Plymouth, Massachusetts. Despite government promises to the contrary, spent nuclear fuel ("SNF") has accumulated at the Pilgrim plant for decades. To cover SNF storage costs

---

[2] This is the twelfth opinion from this court and the United States Court of Appeals for the Federal Circuit related to this dispute. *See Boston Edison Co. v. United States*, 64 Fed. Cl. 167 (2005) ("*Boston Edison I*"); *Boston Edison Co. v. United States*, 67 Fed. Cl. 63 (2005) ("*Boston Edison II*"); *Boston Edison Co. v. United States*, 80 Fed. Cl. 468 (2008) ("*Boston Edison III*"), *appeal dismissed and remanded*, *Boston Edison Co. v. United States*, 299 Fed. Appx. 956 (Fed. Cir. 2008) ("*Boston Edison IV*"); *Boston Edison Co. v. United States*, 93 Fed. Cl. 105 (2010) ("*Boston Edison V*"), *aff'd in part, rev'd in part, and remanded*, *Boston Edison Co. v. United States*, 658 F.3d 1361 (Fed. Cir. 2011) ("*Boston Edison VI*"); *Boston Edison Co. v. United States*, 106 Fed. Cl. 330 (2012) ("*Boston Edison VII*"); *Entergy Nuclear Generation Co. v. United States*, 130 Fed. Cl. 466 (2017) ("*Entergy*"); *Boston Edison Co. v. United States*, 152 Fed. Cl. 358 (2021) ("*Boston Edison VIII*"); *Boston Edison Co. v. United States*, 156 Fed. Cl. 632 (2021) ("*Boston Edison IX*"); *Boston Edison Co. v. United States*, 157 Fed. Cl. 772 (2022) ("*Boston Edison X*").

incurred after the commencement of decommissioning at Pilgrim, the current owner—Holtec—has expended money from Pilgrim's decommissioning trust fund ("decommissioning fund").

Holtec has sued the government for damages related to the Department of Energy's ("DOE") failure to pick up Pilgrim's SNF, including Holtec's post-decommissioning SNF storage costs. NSTAR, Pilgrim's former owner, has also sued the government for those same post-decommissioning SNF storage costs. Thus, both NSTAR and Holtec are basically seeking the same damages, creating a classic "two dogs, one bone" scenario.

This case is the third and latest iteration of NSTAR's twenty-six-year legal battle with the government to recover damages caused by DOE's original 1998 breach. This matter was transferred to the undersigned on October 1, 2024.

NSTAR claims that, when it sold Pilgrim to Holtec,[3] it retained a claim against the government for any money spent from the decommissioning fund on SNF storage costs incurred after decommissioning had begun. The damage to NSTAR allegedly flows from the fact that it funded the decommissioning fund, which it then transferred to Holtec. NSTAR's claim thus extends and indeed is limited to funds that were expended from the decommissioning fund after closing on the sale of Pilgrim. According to NSTAR, it—not Holtec—is the proper plaintiff to sue the government for money currently being expended from the fund on post-decommissioning SNF storage at Pilgrim.

The government and Holtec now move for summary judgment. They argue that NSTAR, when it sold Pilgrim to Holtec, gave up and did not retain any claims for damages arising after the sale because those claims had not yet accrued as required by the sale agreement. NSTAR responds that it retained claims arising from expenditure of money from the decommissioning fund on post-decommissioning SNF storage costs, irrespective of whether that money was spent before or after the sale. NSTAR primarily relies on a series of decisions by Judge Lettow—*Boston Edison VII*, 106 Fed. Cl. 330 (2012), *Entergy*, 130 Fed. Cl. 466 (2017), *Boston*

---

[3] At the time of the sale in 1999, NSTAR was known as Boston Edison Company, and Holtec used the name Entergy Nuclear Generation Company. For clarity, we refer to both companies by their current names.

*Edison VIII*, 152 Fed. Cl. 358 (2021), and *Boston Edison IX*, 156 Fed. Cl. 632 (2021)—in which the late judge consistently found that NSTAR did, in fact, retain the right to bring the claim it now asserts. Critically, the government's and Holtec's respective motions for summary judgment explicitly call into question the correctness of those four decisions and ask that we put an end to NSTAR's pursuit of compensation for breach.

For the reasons set out below, we agree with Holtec and the government and grant their respective motions for summary judgment.

BACKGROUND

I.    PAST PROCEEDINGS

A.    The Pilgrim Sale

1.    NSTAR Prepares to Sell Pilgrim

In 1983, NSTAR contracted with DOE for DOE to collect SNF from NSTAR's Pilgrim Nuclear Power Station, located in Plymouth, Massachusetts.[4] *Boston Edison VI*, 658 F.3d 1361, 1364 (Fed. Cir. 2011). As with other nuclear operators, DOE agreed to collect Pilgrim's SNF no later than January 1998. *Id.* DOE did not, however, begin collecting SNF by the January 1998 deadline and has yet to do so. NSTAR, for its part, consistently paid fees to the government and maintained a decommissioning trust fund. *Id.*

NSTAR maintained a decommissioning trust fund to comply with the applicable regulatory scheme, which requires nuclear plant operators to choose between three options to "provide reasonable assurance that funds will be available for the decommissioning process": (1) prepayment, (2) an external sinking fund, or (3) a surety, insurance, "or other guarantee method." 10 C.F.R. § 50.75(a), (e)(1)(i)–(iii). Here, NSTAR opted to create an external sinking fund in the form of a trust. Holtec's Mot. Summ. J. 3, ECF No. 164. The trust was "maintained by setting funds aside periodically in an account segregated from licensee assets and outside the administrative control of the licensee" such that "the total amount of funds would be sufficient to pay decommissioning costs." 10 C.F.R. § 50.75(e)(1)(ii). Ratepayers funded the

_____

[4] The "Standard Contract" mandated by regulation is found at 10 C.F.R. pt. 961.

trust fund by paying decommissioning fees,[5] and NSTAR invested the funds until needed for decommissioning. *See* Holtec's Mot. Summ. J. 3, ECF No. 164; *Conn. Yankee Atomic Power Co. v. United States*, 169 Fed. Cl. 531, 537 (2024).

In 1997, Massachusetts enacted legislation to restructure the State's electric utility industry. *Boston Edison VI*, 658 F.3d at 1364. As part of that restructuring, NSTAR had to divest itself of the Pilgrim plant. *Id.* Using a competitive auction, NSTAR solicited potential bidders to buy the Pilgrim plant. *Id.* The highest bidder was Holtec. *See id.*

In addition to Pilgrim's physical facilities, NSTAR offered Holtec the "fully-funded decommissioning fund"[6] to cover the costs of decommissioning Pilgrim and post-decommissioning SNF storage[7] "until such time as the Department of Energy takes title to the fuel." *Id.* In exchange, Holtec would assume responsibility for SNF storage and decommissioning as well as gaining "all right, title and interest" to the decommissioning fund. NSTAR Resp. App. at 38, ECF No. 212-2 (sale agreement § 2.1(h)). Ultimately, Holtec purchased Pilgrim (plant, inventory, fuel, and land) for $80 million and accepted all decommissioning and storage responsibilities "in return for a decommissioning fund of $428 million."

---

[5] Upon completion of decommissioning, "[i]f the [f]und balances exceed the amount actually expended for decommissioning . . . the utility shall return the excess jurisdictional amount to ratepayers, in a manner the [Federal Energy Regulatory Commission] determines." 18 C.F.R. § 35.32(a)(7); *see also Conn. Yankee Atomic Power Co. v. United States*, 169 Fed. Cl. 531, 537 (2024) ("Ultimately, if the [decommissioning] funds exceed the amount necessary for decommissioning, any remaining monies must be returned to the ratepayers.").

[6] As we explain below, this court previously determined that in order to "fully fund" the decommissioning fund prior to the sale, NSTAR was forced to put an additional $40.03 million in the fund to account for anticipated post-decommissioning SNF storage costs caused by DOE's breach of the Standard Contract. *Boston Edison III*, 80 Fed. Cl. 468, 490–91 (2008).

[7] While decommissioning funds typically cannot be spent on SNF storage, the Nuclear Regulatory Commission granted a waiver allowing decommissioning funds to be spent on SNF storage. *See* NSTAR Resp. App. at 5–6, ECF No. 212-2.

*Boston Edison VI*, 658 F.3d at 1364. The sale of Pilgrim closed in July 1999. *Id.* at 1365.

### 2.    Section 2.2(g) and the Meaning of "Accrued"

Key to the final sale agreement—and what this present dispute hinges on—is Section 2.2(g) of the Pilgrim sale agreement. That clause states, under the heading "Excluded Assets," that NSTAR would *not* transfer "any claims of [NSTAR] related or pertaining to the Department of Energy's defaults under the DOE Standard Contract accrued as of the Closing Date, whether relating to periods prior to or following the Closing Date." NSTAR Resp. App. at 40, ECF No. 212-2 (sale agreement § 2.2(g)); *see also id.* at 41 (sale agreement § 2.4(a)) (stating that liabilities not assumed by Holtec include "any [l]iability in respect of the Excluded Assets or any other asserts of [NSTAR] that are not Acquired Assets"). Holtec, for its part, assumed all of NSTAR's liabilities for Pilgrim's decommissioning; "the management, storage, transportation, and disposal of [SNF];" "any other post-operative disposition" of Pilgrim; and any liabilities relating to the decommissioning fund and the provisional trust. *Id.* at 41 (sale agreement § 2.3(e)–(f)); *see also Boston Edison VI*, 658 F.3d at 1365 ("[Holtec] received rights to all other claims arising from the Standard Contract.").

The inclusion of Section 2.2(g) was no accident. The Massachusetts Attorney General (who oversaw the regulatory aspect of the Pilgrim sale) insisted that NSTAR retain all claims against DOE arising from DOE's breach of the Standard Contract. *Boston Edison VI*, 658 F.3d at 1365, 1365 n.3 (explaining that in 1996 DOE had announced that it would not begin collecting SNF until 2010 at the earliest). Thus, NSTAR insisted on the language that NSTAR would retain any claims that accrued before the closing date.

Given that the meaning of "accrued," as that term is used in the sale agreement, is central to the arguments in the pending motions, NSTAR asks that we consider extrinsic evidence to help determine what the parties in 1999 intended "accrued" to mean. To that end, NSTAR supplied testimony from various individuals involved in drafting the sale agreement.[8] NSTAR asserts

---

[8] The sale agreement contained an integration clause. *See* NSTAR's Resp. App. at 85, ECF No. 212-2 ("This Agreement . . . constitutes the entire agreement between the Parties and supersedes any prior understandings, agreements, or representations . . . ."). As a result, we may look to extrinsic evidence to help determine the meaning of Section 2.2(g) of the sale

that this extrinsic evidence makes clear that the only reasonable interpretation of Section 2.2(g) is that NSTAR retained the claim it now asserts. As we explain below, however, it is not necessary for us to consider parol evidence in the disposition of this case.

> B.    A Brief History of the Litigation between NSTAR, Holtec, and the Government

As noted, DOE did not begin collecting SNF in January 1998—nor has it done so since. DOE's failure to collect SNF included the failure to collect SNF from the Pilgrim plant. *See Boston Edison VI*, 658 F.3d at 1364. DOE's general failure to collect SNF has been held to be a breach of the Standard Contract, *see Ind. Mich. Power Co. v. Dep't of Energy*, 88 F.3d 1272, 1277 (D.C. Cir. 1996), which gives rise only to a claim for partial breach, *see Ind. Mich. Power Co. v. United States*, 422 F.3d 1369, 1374 (Fed. Cir. 2005) ("*Indiana Michigan*").

> 1.    NSTAR's Original Lawsuit (*Boston Edison I–V*)

As a result of DOE's breach, the day before the sale of Pilgrim closed in July 1999, NSTAR sued in this court, seeking damages for DOE's partial breach of the Standard Contract. *Boston Edison VI*, 658 F.3d at 1365 (summarizing the procedural history of the case). In 2003, Holtec brought its own suit on a partial breach claim beginning "as of the date of the sale." *Id.* This court partially consolidated the actions "for the limited purpose of addressing issues concerning (1) contract formation, (2) contract implementation through the date of sale of the Pilgrim Nuclear Power Station, and (3) [NSTAR]'s diminution-in-value claim and the government's attendant offset claim against [Holtec]." *Boston Edison VII*, 106 Fed. Cl. at 334 (quoting *Boston Edison II*, 67 Fed. Cl. 63, 67 (2005)). We awarded $4

---

agreement only if we find the specific language of the sale agreement to be ambiguous. *See Allen v. United States*, 119 Fed. Cl. 461, 481 (2015) (explaining that, under the parol evidence rule, extrinsic evidence pre-dating a contract cannot be used to modify the contract's meaning when the contract is unambiguous and the parties adopted the contract as the written expression of their final understanding). And even if the agreement is ambiguous, not just any extrinsic evidence is admissible; instead, our caselaw suggests that parol evidence "regarding pre-dispute actions and interpretations" can be relevant if those interpretations are "*made known to the other party*." *Cray Rsch., Inc. v. United States*, 41 Fed. Cl. 427, 436 (1998) (emphasis added).

million to Holtec "for mitigation costs resulting from the government's partial breach following Pilgrim's transfer to [Holtec] through the end of 2008." *Id.* at 334.

NSTAR, for its part, sought damages under a diminution-in-value theory for damages caused by DOE's breach. *Boston Edison I*, 64 Fed. Cl. 167, 174 (2005). Specifically, NSTAR alleged that, by not picking up SNF, DOE reduced the value of the Pilgrim plant, forcing NSTAR, as part of the sale of the Pilgrim plant, to contribute additional funds to the decommissioning fund to cover future SNF storage costs associated with the Pilgrim plant's decommissioning. *Boston Edison III*, 80 Fed. Cl. 468, 488–89 (2008).

We found for NSTAR, determining that $40.03 million was the amount it was forced to add to the decommissioning fund to offset Holtec's anticipated future SNF storage costs that would begin to accrue when decommissioning began. *Id.* at 490–91. Put another way, the $40.03 million "represented the portion of the decommissioning fund corresponding to the projected post-decommissioning SNF-related costs that would be attributable to DOE's breach." *Boston Edison VI*, 658 F.3d at 1365. In reaching that outcome, this court found that (1) it was reasonably foreseeable that NSTAR would transfer the decommissioning fund to a third party and (2) that "any such transfer would need to account for the risk that DOE would continue to delay performance after Pilgrim was decommissioned." *Id.* Therefore, the court determined that DOE's breach had directly caused NSTAR to pay a larger sum into the decommissioning fund to relieve itself of decommissioning responsibilities. *Id.*

### 2.    Reversal at the Federal Circuit (*Boston Edison VI*)

The Federal Circuit reversed. It held that that NSTAR "cannot recover damages under a diminution-of-value theory in a partial breach setting." *Boston Edison VI*, 658 F.3d at 1366. That is because damages are limited in partial breach cases to those incurred by the time of the suit; future damages can only be recovered in later suits after they are incurred. *Id.* In other words, "'prospective damages for *anticipated future nonperformance*' are not recoverable in a partial breach case." *Id.* at 1367 (emphasis added) (quoting *Indiana Michigan*, 422 F.3d at 1376). As the Federal Circuit recognized, concluding that NSTAR was damaged by adding $40.03 million to the decommissioning fund for future SNF storage costs was inherently speculative because that money had not yet been expended from the decommissioning fund on SNF storage costs resulting from DOE's future

continued breach. *See id.* at 1366–67. In short, "[t]he actual value of the future damages attributable to DOE's continued partial breach of contract was no less speculative simply because [NSTAR] and [Holtec] attached a price to it." *Id.* at 1367. The Federal Circuit concluded that damages for post-decommissioning SNF storage at Pilgrim could only be pursued "in subsequent actions commenced after the government's continued breach of contract results in further damages." *Id.*

The Federal Circuit reversed the damages award to NSTAR, partially reversed the damages award to Holtec on grounds not relevant here, and remanded. *Id.* at 1367, 1372. The Federal Circuit further made plain what it did not decide: "We do not decide the respective rights of [NSTAR] and [Holtec] relating to any partial or total breach of contract by DOE that postdates the decommissioning of the Pilgrim facility." *Id.* at 1367 n.4. Nor did the Federal Circuit "address the government's argument that [NSTAR]'s transfer of expected post-decommissioning [SNF] expenses relieves DOE of its obligation to pay those expenses once incurred." *Id.*

### 3. The Court's Dismissal of NSTAR's Claims on Ripeness Grounds (*Boston Edison VII* and *Entergy*)

On remand, Holtec and the government entered a stipulation for final judgment of Holtec's claims. *Boston Edison VII*, 106 Fed. Cl. at 334. Accordingly, this court "entered final judgment for [Holtec] according to the terms of the parties' stipulation and consequently severed the partial consolidation of the parties' claims." *Id.* at 335. Later, the government moved for reconsideration of that ruling, arguing alternatively that (1) the court erred in severing the cases because Holtec's and NSTAR's claims remained intertwined or (2) the court erred in not dismissing NSTAR's case with prejudice because the Federal Circuit's decision in *Boston Edison VI* made clear that NSTAR had no claim for relief. *Id.*

This court treated the government's motion for reconsideration as a motion to dismiss NSTAR's claim. *Boston Edison VII*, 106 Fed. Cl. at 335–36, 343. The government argued that dismissal with prejudice was proper because the "Federal Circuit fully and completely disposed" of NSTAR's diminution-in-value claim. *Id.* at 336. Judge Lettow denied the motion, stating that "the Federal Circuit recognized that [NSTAR] has a nascent claim for decommissioning costs and implicitly remanded to this court the adjudication of that claim." *Id.* at 337; *see also id.* at 341 ("[T]he Federal Circuit recast rather than rejected [NSTAR]'s claim . . . ."). By focusing on the Federal Circuit's language that damages would be "recoverable only in

subsequent actions commenced after the government's *continued breach of contract* results in further damages," he concluded that NSTAR retained a claim, although he did not specify what legal theory could support NSTAR's "nascent" claim. *Id.* at 340–42 (quoting *Boston Edison VI*, 658 F.3d at 1367).

Instead, this court explained why it believed NSTAR possessed a claim, even though it was not explicitly defined. Judge Lettow noted that NSTAR had suffered "an injury springing from" DOE's pre-sale breach and that the sale agreement gave NSTAR rights to claims "related or pertaining to" DOE's breach that had "accrued as of the Closing Date, whether relating to periods prior to *or following* the Closing Date." *Id.* at 340 (quoting *Boston Edison VI*, 658 F.3d at 1365). The court warned against reading the word "accrued" as "foreclos[ing] [NSTAR] from asserting a claim for decommissioning costs in the future." *Id.* Instead, Judge Lettow reasoned that "the contract provides that [NSTAR's] claims may arise after the contract's closing date" because "a partial breach has two necessary accrual events": (1) the original breach and (2) "the incurring of actual present damages from the breach." *Id.* Put another way, "while the foundational elements of" NSTAR's claim "were established when DOE first breached the contract, the uncertainty of damages inherent to partial-breach cases counsels against allowing a current case to collect those prospective damages." *Id.* at 341. Therefore, the court held that NSTAR's claim for *"decommissioning costs is extant, but it will fully mature only when particular mitigating costs are expended at and on decommissioning." Id.* (emphasis added). This court then dismissed NSTAR's claim without prejudice and granted leave to refile "when costs to mitigate DOE's breach of the Standard Contract are incurred on decommissioning Pilgrim." *Id.* at 343.

In 2016, NSTAR filed suit, but this court again dismissed NSTAR's case as premature. *Entergy*, 130 Fed. Cl. at 468, 475.[9] NSTAR claimed that its damages were then ascertainable because decommissioning had begun at Pilgrim. *Id.* at 470. The government moved to dismiss, arguing, alternatively, that (1) NSTAR forfeited its claims in the sales agreement, (2) NSTAR's claims were barred by the statute of limitations, and (3) its claims were not

---

[9] Both Entergy (now Holtec) and Boston Edison (now NSTAR) had brought separate suits against the government (Nos. 14-1248C & 16-589C). *Entergy*, 130 Fed. Cl. at 467. The suits were never consolidated. However, the opinion is cited as "*Entergy*" because it was a reported opinion that disposed of motions in both dockets while listing the *Entergy* case in the caption first. *See id.* at 468.

ripe because NSTAR had not incurred damages. *Id.* at 470–71. In a footnote, the court rejected the government's first two arguments, noting that the court had previously considered and rejected those same arguments in *Boston Edison I* and *VII*. *Id.* at 472 n.6. While recognizing that "the decommissioning of Pilgrim is critical to [NSTAR]'s claims because [Holtec] will expend funds for the storage of SNF *after* decommissioning begins, resulting in ascertainable damages for [NSTAR]," the court concluded that Holtec had not commenced decommissioning. *Id.* at 473–75. Accordingly, the court dismissed NSTAR's suit as unripe. *Id.* at 475.

   4.   The Court's Denial of the Government's Previous
        Motion to Dismiss in This Case (*Boston Edison VIII*)

   NSTAR sued again in 2020. It sought damages in excess of $40 million stemming from NSTAR's provision of additional money to the decommissioning fund in 1999 to cover post-decommissioning SNF storage costs. *Boston Edison VIII*, 152 Fed. Cl. at 361. NSTAR alleged that Holtec had begun decommissioning Pilgrim and had spent over $56 million from the decommissioning fund for SNF costs. *Id.* The government moved to dismiss, arguing that the Federal Circuit had already rejected NSTAR's diminution-in-value claim. *Id.* at 361–62.

   This court again rejected the government's argument. First, the court reiterated that, through Section 2.2(g) of the 1999 sale agreement, NSTAR "expressly retained" a claim for post-decommissioning SNF storage costs that would ripen once decommissioning had begun. *Id.* at 363–64 (citing *Boston Edison VII*, 106 Fed. Cl. at 340). Now that decommissioning had begun, the court reasoned, NSTAR's damages were no longer speculative. *Id.* at 364. Second, the court stated that the Federal Circuit did not foreclose NSTAR's claims—based on diminution-in-value—but simply held that they were not recoverable at that time. *Id.* The court noted that NSTAR had paid over $40 million into the decommissioning fund, and Holtec had already spent $56 million from the fund on decommissioning costs. *Id.* Accordingly, the court denied the government's motion. *Id.*

   5.   The Court's Denial of Holtec's First Motion for
        Summary Judgment Following Intervention (*Boston Edison IX*)

   In 2021, Holtec intervened in NSTAR's suit and moved for summary judgment against NSTAR, which this court denied. *Boston Edison IX*, 156

Fed. Cl. at 644.[10] Holtec advanced four alternative arguments in support of its motion: (1) that NSTAR failed to retain claims based on future decommissioning costs, (2) that any retained claims were time barred, (3) that any remaining claims were limited to $40.03 million (the amount this court previously determined represented NSTAR's contribution to the decommissioning fund to cover post-decommissioning SNF storage costs), and (4) that any remaining claims would not be ripe until after decommissioning ended and DOE took title to the fund. *Id.* at 636.

The court rejected each of Holtec's arguments. First, citing its decisions in *Boston Edison VII* and *VIII*, the court held that NSTAR retained claims to future damages because it "expended money to mitigate DOE's breach" when it was forced to overfund the decommissioning trust fund, and "the damages resulting from that mitigation-related expense were not ascertainable until after the closing date" when the government's breach would result in damages at and on decommissioning. *Id.* at 638. Addressing the language in Section 2.2(g) of the sale agreement, the court stressed that "[a]ccrual has a different meaning in different contexts." *Id.* at 637 (quoting *Boston Edison VII*, 106 Fed. Cl. at 340). Under the court's reading of "accrued," NSTAR's "decommissioning claims accrued before the sale to [Holtec] in 1999 because 'the foundational elements of [NSTAR]'s cause of action for breach of contract were established when DOE *first breached the contract*.'" *Id.* at 638 (emphasis added) (quoting *Boston Edison VII*, 106 Fed. Cl. at 341). Second, the court held that nevertheless the statute of limitations had not run because NSTAR did not incur damages until the decommissioning process began. *Id.* at 639. Third, the court held that the matter was ripe for adjudication because funds were being spent on SNF storage from the decommissioning fund. *Id.* at 639–40. Finally, the court stated that it was premature to rule on NSTAR's damages and refused to limit NSTAR's damages to $40.03 million. *Id.* at 640. Accordingly, the court denied Holtec's motion for summary judgment.

## II.    PROCEDURAL HISTORY OF THE PRESENT DISPUTE

After Holtec's motion for summary judgment and the following motion to certify for interlocutory appeal were denied, NSTAR twice amended its complaint. *See* First Am. & Suppl. Compl., ECF No. 72; Second Am. Compl., ECF No. 118. In its original complaint, NSTAR sought

---

[10] On July 15, 2022, Holtec sued the government on its own behalf. And on August 1, 2022, we consolidated Holtec's suit with NSTAR's.

damages of "not less than $40 million" because NSTAR "was forced to pay over $40 million for the storage and management of SNF that DOE failed to timely accept[, and] [t]his payment was to mitigate DOE's breach . . . and was directly, proximately, and foreseeably caused by DOE's material breach." Compl. 11–12, ECF No. 1. In its amended complaints, by contrast, NSTAR sought no less than $200 million. *See* First Am. & Suppl. Compl. 12, ECF No. 72; Second Am. Compl. 12, ECF No. 118.

NSTAR supports its requested damages on the ground that the Pilgrim plant has "incurred more than $230 million in SNF costs in connection with decommissioning." Second Am. Compl. 12, ECF No. 118. Thus, it is clear that NSTAR is seeking to recover as its own damages post-decommissioning SNF storage costs that have been incurred by Holtec.[11] In fact, NSTAR's complaint acknowledges that it could only recover SNF-related damages once Holtec began incurring SNF storage costs after decommissioning began on May 31, 2019. *Id.* at 9, 11–12.

After further discovery, the government and Holtec concurrently moved for summary judgment against NSTAR. With the issues fully briefed, and having heard the parties' oral arguments on October 24, 2025, this matter is ready for adjudication.

DISCUSSION

While deploying slightly different arguments, the government and Holtec both contend that, in the 1999 sale agreement, NSTAR retained only those pre-sale claims that had "accrued" as of the closing date. In their view, "accrued," as that term is used in Section 2.2(g) of the sale agreement, means that any retained claim must have been presently actionable when the sale closed. Thus, they conclude, NSTAR cannot claim damages for money spent by Holtec after NSTAR sold the Pilgrim plant. NSTAR's principal response is that our consideration of this argument is foreclosed by the doctrine of issue preclusion (or "collateral estoppel") based on Judge Lettow's decisions in *Boston Edison VII* and *Entergy*. Additionally, NSTAR asserts that the law of the case doctrine also applies here based on Judge Lettow's decisions in *Boston Edison VIII* and *Boston Edison IX*. Alternatively, NSTAR argues that

---

[11] NSTAR also points out that Holtec's costs have been "paid for from the Decommissioning Trust Fund," which NSTAR was forced to overfund by $40 million to "mitigate DOE's breach." Second Am. Compl. 12, ECF No. 118.

this court's prior determination that NSTAR retained the claim it now asserts is the only reasonable interpretation of Section 2.2(g). And to the extent that Section 2.2(g) is ambiguous, NSTAR argues that parol evidence makes clear that Section 2.2(g) retained in NSTAR the claim it now asserts.

Having considered the parties' arguments, we determine that summary judgment in favor of the government and Holtec is proper. Here is what we know: The sales agreement reserved for NSTAR only those claims that had "accrued" as of the time of the 1999 closing. NSTAR's 1999 claim that DOE's breach of its obligation to collect SNF caused a diminution of value of Pilgrim, forcing NSTAR to contribute more money to the decommissioning fund, was, however, rejected by the Federal Circuit on the ground that it was incompatible with *Indiana Michigan*'s rule prohibiting the "recovery of future damages in cases in which DOE has breached the Standard Contract." *Boston Edison VI*, 658 F.3d at 1367. In *Indiana Michigan*, the Federal Circuit explained that, with respect to claims for breach of contract based on DOE's failure to pick up SNF, such a claim is for partial breach and "the plaintiff can recover only such damages as he or she has sustained, *leaving prospective damages to a later suit in the event of further breaches*." *Indiana Michigan*, 422 F.3d at 1377 (citation omitted). Therefore, a claim for post-decommissioning SNF storage costs, *irrespective of which party owned the claim*, had to await the actual expenditure of money on SNF storage costs after Pilgrim's decommissioning had begun.

We also know that the expenditure of money for post-decommissioning SNF storage did not commence until decommissioning started on May 31, 2019, and, moreover, that those monies were spent from a decommissioning fund wholly owned by Holtec, not NSTAR.

Finally, we know that NSTAR's current and only claim was filed on April 29, 2020. Thus, to avoid running afoul of the six-year limitations period, NSTAR's cause of action cannot have accrued (for purposes of the applicable statute of limitations) earlier than April 30, 2014.

The sole support for NSTAR's current complaint is Judge Lettow's prior rulings that NSTAR reserved a cause of action that had "accrued" (for purposes of the sale agreement) by the 1999 closing date but which was inchoate, i.e., not actionable, until Holtec began decommissioning Pilgrim and incurring post-decommissioning SNF storage costs. Because it accrued (for purposes of the sale agreement) before the 1999 closing, it was preserved as an ongoing claim, but because it was inchoate and not actionable until post-decommissioning SNF storage costs were incurred, the statute of

14

limitations was not a problem. In other words, the term "accrued" in Judge Lettow's view had a very light duty to perform under Section 2.2(g) of the sale agreement. It was merely tagging the 1998 breach as a source for potential future lawsuits and did not mean "presently actionable."

Judge Lettow's view of the case, and consequently NSTAR's current claim, is thus predicated on two propositions: (1) NSTAR's claim accrued for purposes of the sales agreement's retention language prior to the 1999 closing but (2) was nevertheless not legally actionable until at least May 31, 2019, the date Pilgrim's decommissioning began. As we explain below, these two propositions are incompatible with Federal Circuit precedent because NSTAR's current claim for SNF storage costs incurred after decommissioning began on May 31, 2019, cannot have existed as of the July 1999 closing and, therefore, was not retained in the sale agreement. To reach that conclusion, however, we must first address NSTAR's assertion that the court cannot entertain the argument that Judge Lettow was incorrect because of issue preclusion and the law of the case doctrine.

I.    STANDARD OF REVIEW

Summary judgment is proper when the movant "shows that there is no genuine dispute" of "material fact" and that the "movant is entitled to judgment as a matter of law." RCFC 56(a). A fact is material if it might affect the suit's outcome. *Silver State Land, LLC v. United States*, 155 Fed. Cl. 209, 212 (2021). There is a genuine dispute when the fact finder may reasonably resolve the dispute in favor of either party. *Id.* We read all factual inferences in favor of the nonmoving party. *Id.*

II.   NEITHER ISSUE PRECLUSION NOR THE LAW OF THE CASE DOCTRINE PRECLUDE CONSIDERATION OF THE GOVERNMENT'S AND HOLTEC'S MOTIONS

A.    Issue Preclusion Does Not Apply to the Government's and Holtec's Motions

Under the doctrine of issue preclusion (or "collateral estoppel"), "issues which are actually and necessarily determined by a court of competent jurisdiction are normally conclusive in a subsequent suit involving the parties to the prior litigation." *Int'l Ord. of Job's Daughters v. Lindeburg & Co.*, 727 F.2d 1087, 1090 (Fed. Cir. 1984). The doctrine "serves to 'relieve parties of the cost and vexation of multiple lawsuits, conserve judicial resources, and, by preventing inconsistent decisions, encourage reliance on

adjudication.'" *Cheyenne-Arapaho Tribes of Okla. v. United States*, 33 Fed. Cl. 464, 466 (1995) (quoting *United States v. Mendoza*, 464 U.S. 154, 158 (1984)). Issue preclusion applies when: "(i) the issue previously adjudicated is identical [to] that now presented, (ii) that issue was actually litigated in the prior case, (iii) the previous determination of that issue was necessary to the end-decision then made, and (iv) the party precluded was fully represented in the prior action." *Machulas v. United States*, 107 Fed. Cl. 119, 123 (2012) (quoting *Whiteman v. Dep't of Transp.*, 688 F.3d 1336, 1340 (Fed. Cir. 2012)). In most circumstances, the fourth element cannot be satisfied unless the party to be precluded was "a party to the prior litigation." *Hanford Tank Disposition All., LLC (HTDA) v. United States*, 173 Fed. Cl. 269, 293 (2024) (quoting *Mendoza*, 464 U.S. at 158).

NSTAR asserts that the doctrine of issue preclusion bars the government and Holtec from asserting the issues they raise in their respective motions for summary judgment: namely, (1) whether NSTAR retained the claim it now asserts and, if so, (2) whether that claim is barred by the statute of limitations. NSTAR asserts that all four required elements are met here. The government and Holtec disagree. The government primarily argues that, because this court's decisions in *Boston Edison VII* and *Entergy* ended with a dismissal without prejudice on jurisdictional grounds (ripeness), the parties' rights under the sale agreement were not actually litigated or necessarily decided. While agreeing with the government, Holtec primarily argues that issue preclusion does not apply, at least as to its motion, because it was not a party to either *Boston Edison VII* or *Entergy*.

NSTAR counters that the issues here were both actually litigated and necessarily decided because the determination that NSTAR possessed a claim under Section 2.2(g) and could bring such claim in the future was critical to this court's decision to dismiss both *Boston Edison VII* and *Entergy* without prejudice as opposed to with prejudice. NSTAR also argues that the government inappropriately conflates jurisdiction and ripeness, but, even if this court dismissed NSTAR's complaints in *Boston Edison VII* and *Entergy* on jurisdictional grounds, those decisions still have preclusive effect. NSTAR further argues that Holtec had a full and fair opportunity to litigate the issues raised here in both *Boston Edison VII* and *Entergy*.

We agree with both the government and Holtec. First, while it is true that this court discussed at length the viability of NSTAR's claims under Section 2.2(g) of the sale agreement in its 2012 decision in *Boston Edison VII* and doubled down on that discussion in *Entergy*, the dismissals

ultimately were based on lack of ripeness and hence were nonprejudicial. *Boston Edison VII*, 106 Fed. Cl. at 342 ("Because presentation of [NSTAR]'s claim 'must await a more concrete setting,' *Molins PLC v. Quigg*, 837 F.2d 1064, 1068 (Fed. Cir. 1988), it should be dismissed."); *Entergy*, 130 Fed. Cl. 466, 475 (2017) (dismissing NSTAR's complaint "because its claim [was] not yet ripe.").[12]

Contrary to NSTAR's characterization of ripeness and jurisdiction as two completely unrelated issues,[13] the fact that NSTAR's claims in both *Boston Edison VII* and *Entergy* were dismissed on ripeness grounds is critical

---

[12] As NSTAR points out, this court in *Boston Edison VII* stated that "[j]urisdiction is not at issue." *Boston Edison VII*, 106 Fed. Cl. at 335. But this does not change the fact that *Boston Edison VII* was dismissed for lack of ripeness. Rather, this court was merely addressing whether NSTAR's asserted claim fell within this court's subject-matter jurisdiction under the Tucker Act. Indeed, the very next sentence in that opinion states that NSTAR's "claim for breach of contract falls squarely within this court's jurisdiction under the Tucker Act." *Id.* Although this court characterized its decision in *Boston Edison VII* to dismiss NSTAR's case without prejudice as a decision made on "prudential grounds," *id.* at 333, it is clear to us that the basis for the dismissal was that NSTAR's claim was unripe. That conclusion is demanded by this court's recognition that NSTAR could only bring a ripe claim "when *and if* breach-mitigating costs are incurred from the decommissioning fund." *Id.* at 343 (emphasis added). Therefore, this court's prior characterization of its dismissal without prejudice as being prudential rather than jurisdictional is not controlling.

[13] NSTAR focuses on the concept that "[j]urisdiction and justiciability are 'distinct' judicial constraints." *Gersten v. United States*, 173 Fed. Cl. 760, 765 (2024) (quoting *Murphy v. United States*, 993 F.2d 871, 872 (Fed. Cir. 1993)). While this is true in the abstract, it misses the point. This court is one of limited jurisdiction, and the primary source of our jurisdiction is the Tucker Act. "Even if a claim" is of a type that falls within the reach of the Tucker Act, "it must also be ripe in order for the court to exercise its authority." *Martin v. United States*, 131 Fed. Cl. 648, 651 (2017). And pursuant to the justiciability requirements of Article III of the Constitution of the United States, *see United Water Conservation Dist. v. United States*, 164 Fed. Cl. 79, 87 (2023), *aff'd*, 133 F.4th 1050 (Fed. Cir. 2025), this court "does not have jurisdiction over claims that are not ripe." *Doyle v. United States*, 165 Fed. Cl. 161, 165 (2023) (citation omitted).

because a "claim must be ripe for adjudication for the court to have subject-matter jurisdiction over the claim." *United Water Conservation Dist. v. United States*, 164 Fed. Cl. 79, 86 (2023) (citing *Schooner Harbor Ventures, Inc. v. United States*, 92 Fed. Cl. 373, 378–79 (2010)), *aff'd*, 133 F.4th 1050 (Fed. Cir. 2025). It is axiomatic that a court without jurisdiction "cannot proceed at all in any cause. Jurisdiction is power to declare the law, and when it ceases to exist, the only function remaining to the court is that of announcing the fact and dismissing the cause." *Angel v. United States*, 172 Fed. Cl. 102, 117 (2024) (quoting *Ex parte McCardle*, 74 U.S. (7 Wall.) 506, 514 (1869)). Therefore, and perhaps most importantly, this court "must address ripeness as a threshold consideration before addressing the merits." *United Water Conservation Dist. v. United States*, 133 F.4th 1050, 1055 (Fed. Cir. 2025) (citation omitted).

Accordingly, this court's determination in *Boston Edison VII* that NSTAR retained a claim and that such claim was not time barred, and its reaffirmation of that determination in *Entergy*, were, by definition, not necessary to its end decision in either of those cases. In both cases, this court's ultimate decision was to dismiss NSTAR's claim on ripeness grounds. And in both cases, by finding that NSTAR's claim was not ripe, the court inherently found that it did not have subject-matter jurisdiction. Therefore, the court did not, and plainly could not have, decided on the merits the respective rights of NSTAR and Holtec under Section 2.2(g) of the sale agreement. *See id.* at 1055. Simply put, this court's discussion in both cases purporting to resolve the merits of whether NSTAR retained a claim through Section 2.2(g) of the sale agreement was *obiter dictum*. The only determination in either case that was "necessary" to the court's decision to dismiss on ripeness grounds was that the claim NSTAR sought to bring was not ripe and would not ripen until decommissioning. The court's comments on the proper ownership and viability under the statute of limitations of NSTAR's claim were immaterial to the separate inquiry of whether the claim NSTAR sought to bring was ripe. This court's statements in *Boston Edison VII* and *Entergy* regarding whether NSTAR retained the claim it now asserts and whether that claim is barred by the statute of limitations were therefore not necessary to the decisions in either case; thus, issue preclusion does not prevent us from addressing those issues now.

Nor would issue preclusion apply here, at least with respect to Holtec, because it was not a party to either *Boston Edison VII* or *Entergy*. This court's decision in *Boston Edison VII* was rendered after this court severed NSTAR's and Holtec's partially consolidated cases and entered a final judgment in

Holtec's case consistent with Holtec's and the government's stipulation for entry of final judgment. *Boston Edison VII*, 106 Fed. Cl. at 332. In *Entergy*, Holtec merely participated as *amicus curiae*, which, as noted by Holtec, definitionally means Holtec was not a party in either *Boston Edison VII* or *Entergy*.

NSTAR argues that even if Holtec was not technically a party, issue preclusion still applies because Holtec "fully participated" in each case. We disagree. In *Boston Edison VII*, Holtec opposed the government's motion to reconsider the court's order severing the partial consolidation and entering final judgment in Holtec's then-separate case in favor of Holtec. In its response to the government's motion for reconsideration, Holtec argued (1) that there was nothing left to be decided in Holtec's case because Holtec and the government stipulated to damages and costs and (2) that severing Holtec's case from NSTAR's was proper because whatever claims NSTAR retained under the sale agreement were "temporally distinct" from those at issue in Holtec's case. Therefore, in *Boston Edison VII*, Holtec did not have a "full and fair opportunity to litigate," *Montana v. United States*, 440 U.S. 147, 153–54 (1979), the merits of the question of the proper ownership of NSTAR's asserted claim and whether that claim was time barred. Those issues were not pertinent to Holtec's opposition to the government's motion for reconsideration. As to *Entergy*, NSTAR does not point to any case that stands for the proposition that a party's participation in a prior suit as *amicus curiae* alone is enough to render issue preclusion applicable to that party. *See United States v. Cinemark USA, Inc.*, 348 F.3d 569, 583 (6th Cir. 2003) (citation omitted) ("As a general matter, *amicus* participation does not trigger collateral estoppel."). We decline to expand the principle here.

As the United States Supreme Court has recognized, "the rule against nonparty preclusion is subject to exceptions." *Taylor v. Sturgell*, 553 U.S. 880, 893 (2008). NSTAR argues that one such exception, "adequate representation," is applicable here. Under that exception, "a nonparty may be bound by a judgment" if the nonparty "was 'adequately represented by someone with the same interest who [was] a party' to the suit." *Taylor*, 553 U.S. at 894 (quoting *Richards v. Jefferson Cty.*, 517 U.S. 793, 798 (1996)). That exception applies only, however, if, "at a minimum: (1) The interests of the nonparty and [its] representative are aligned; and (2) either the party understood [itself] to be acting in a representative capacity or the original court took care to protect the interests of the nonparty." *Cannon v. Armstrong Containers Inc.*, 92 F.4th 688, 712 (7th Cir. 2024) (quoting *Taylor*, 553 U.S. at 900); *see also In re Bestwall LLC*, 47 F.4th 233, 244–45 (3d Cir. 2022).

There is no doubt that in both *Boston Edison VII* and *Entergy*, the government argued the issues presented here, at least in part, consistently with Holtec's interests. However, NSTAR mistakenly concludes that this fact alone renders Holtec's interests adequately represented. The adequate representation exception applies primarily to class actions and "suits brought by trustees, guardians, and *other fiduciaries*." *WesternGeco LLC v. ION Geophysical Corp.*, 889 F.3d 1308, 1320 (Fed. Cir. 2018) (emphasis added) (quoting *Taylor*, 553 U.S. at 894–95). Here, there is no such relationship between Holtec and the government. That the government agreed with Holtec's position on any particular point does not *ipso facto* mean that the government adequately represented Holtec's interest. The proper interpretation of Section 2.2(g) impacts the government only insofar as it controls to whom the government may owe damages. Indeed, the government's real concern from the beginning was to ensure that it did not have to pay the same damages twice. But from the government's perspective, if it is determined to be liable for its continued breach of the Standard Contract, it is relatively immaterial who receives those damages.

Holtec's interest, on the other hand, is more existential. From Holtec's perspective, the proper interpretation of Section 2.2(g) of the sale agreement is dispositive on the question of who gets to assert the claims for post-decommissioning SNF costs expended from the fund. Thus, although the government's and Holtec's views of the proper interpretation of Section 2.2(g) of the sale agreement have consistently aligned, their *interest* in that determination can hardly be said to be "coextensive." *Underwood Livestock, Inc. v. United States*, 89 Fed. Cl. 287, 301 (2009). Therefore, we hold that the "adequate representation" exception does not apply here, and, thus, the general rule against nonparty preclusion applies in full force.

In sum, we hold that issue preclusion does not preclude this court from considering the proper interpretation of Section 2.2(g) of the sale agreement because (1) this court's prior *dicta* on that issue in both *Boston Edison VII* and *Entergy* was not necessary to its end decision in either case and (2) no exception to the general rule against nonparty issue preclusion applies to overcome the fact that Holtec was not a party to either case.

B.    The Law of the Case Doctrine Likewise Does Not Prevent Consideration of the Government's and Holtec's Motions

Alternatively, NSTAR argues that the law of the case doctrine prevents us from addressing the issues raised by the government and Holtec because those issues were already decided by the court in both *Boston Edison*

20

*VIII* and *Boston Edison IX*. In response, while focusing on the discretionary nature of the law of the case doctrine, the government and Holtec argue that the law of the case doctrine has no applicability here because this court's prior decisions were clearly erroneous.

The law of the case doctrine stands for the proposition that, "when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case." *Oasis Int'l Waters, Inc. v. United States*, 135 Fed. Cl. 230, 246 (2017) (quoting *Arizona v. California*, 460 U.S. 605, 618 (1983), *decision supplemented*, 466 U.S. 144 (1984)). While rooted in principles of fairness and judicial economy, the law of the case doctrine is fundamentally a "judicially created[,] . . . discretionary doctrine that, . . . 'as applied to the effect of previous orders on the later action of the court rendering them in the same case, merely expresses the practice of courts generally to refuse to reopen what has been decided, not a limit to their power.'" *Id.* at 246–47 (quoting *Messenger v. Anderson*, 225 U.S. 436, 444 (1912)).

Although we have the power to revisit our prior decisions, we are "loathe to do so in the absence of extraordinary circumstances." *Id.* at 247 (quoting *Christianson v. Colt Indus. Operating Corp.*, 486 U.S. 800, 816 (1988)). Nevertheless, the Federal Circuit has recognized multiple situations that rise to the level of "extraordinary circumstances" such that "departure from the law of the case doctrine" is justified. *Id.* One such circumstance is "when the prior decision is clearly incorrect and its preservation would work a manifest injustice." *Id.* (quoting *Intergraph Corp. v. Intel Corp.*, 253 F.3d 695, 698 (Fed. Cir. 2001)). We find such a circumstance present here. There is no question that this court addressed the validity and nature of NSTAR's claims in *Boston Edison VIII* and *IX*, both of which were decisions rendered in this case. But, as we explain below, because both of those decisions were clearly incorrect and adherence to them would unjustly grant NSTAR the right to recover post-decommissioning SNF storage costs to which it is not entitled, the law of the case doctrine does not apply here.

III.    NSTAR HAS NO VIABLE CLAIM AGAINST THE GOVERNMENT

The government's and Holtec's motions raise two issues: (1) Whether NSTAR retained a claim under Section 2.2(g) of the sale agreement for post-decommissioning SNF storage costs, and, if so, (2) whether that claim is barred by the statute of limitations. Because we find that NSTAR did not

21

retain under Section 2.2(g) a claim for post-decommissioning SNF storage costs, we need not address the statute of limitations issue.

The crux of the government's and Holtec's arguments on the first issue is that NSTAR could not have retained the claim it asserts here because, under the terms of the sale agreement, the claims had not "accrued" as of the 1999 closing date. They argue that this result is mandated by the clear and unambiguous meaning of the term "accrued" as defined by the Federal Circuit in *Indiana Michigan*, 422 F.3d 1369 (Fed. Cir. 2005), and the Supreme Court of the United States in its recent decision in *Corner Post, Inc. v. Board of Governors of the Federal Reserve System*, 603 U.S. 799 (2024).[14]

NSTAR counters that the definitions of the word "accrued" from *Corner Post* and *Indiana Michigan* do not control the proper interpretation of Section 2.2(g). NSTAR puts forth five primary arguments in support of this assertion: (1) that *Indiana Michigan* and *Corner Post* postdate the drafting and closing of the contract and thus cannot retroactively define the contract language; (2) that *Indiana Michigan* and *Corner Post* define "accrued" in the limited context of statutes of limitations, which has nothing to do with the use of the word in Section 2.2(g) of the sale agreement; (3) that even if the parties meant to incorporate the *Indiana Michigan* and *Corner Post* definitions, the parties believed NSTAR's claims had accrued at closing; (4) that if the parties meant to incorporate a statute of limitations definition of "accrued," the sale agreement required looking to Massachusetts law;[15] and (5) that treating the definition of "accrued" in

---

[14] In *Corner Post*, the Supreme Court held that a claim accrues "when the plaintiff has a complete and present cause of action." *Corner Post*, 603 U.S. at 810 (quoting *Gabelli v. SEC*, 568 U. S. 442, 448 (2013)). In *Indiana Michigan*, the Federal Circuit stated that "a cause of action accrues [only] when all the events have occurred that fix the defendant's alleged liability and entitle the plaintiff to institute an action." *Indiana Michigan*, 422 F.3d at 1378 (Fed. Cir. 2005) (quoting *Fallini v. United States*, 56 F.3d 1378, 1380 (Fed. Cir. 1995)). We see no material difference between the Supreme Court's definition of "accrue" in *Corner Post* and the Federal Circuit's definition in *Indiana Michigan*.

[15] Section 11.9 of the sale agreement requires the contract to be "construed in accordance with the domestic laws of the Commonwealth of Massachusetts." Massachusetts law provides that a breach of contract claim "accrues" for statutes of limitations purposes when the breach occurs, *Campanella & Cardi Constr. Co. v. Commonwealth*, 217 N.E.2d 925, 926

isolation as dispositive as to the meaning of Section 2.2(g) ignores the principle that contracts are to be interpreted as a whole, giving a reasonable meaning to all its parts without plucking a single word out of context. Instead, NSTAR argues that Section 2.2(g), including the meaning of the word "accrued," is at least ambiguous. Thus, it urges the court to look at extrinsic, parol evidence which it argues, at a minimum, creates a genuine issue of material fact on what the parties intended Section 2.2(g) to mean.

Turning to the language of the sale agreement, Section 2.2(g) retained "any claims of [NSTAR] related to or pertaining to the [DOE]'s defaults under the DOE Standard Contract accrued as of the Closing Date, whether relating to periods prior to or following the Closing Date." The critical inquiry for our purposes is the meaning of the word "accrued" and how it modifies the word "claims."[16] We hold that NSTAR has no right under Section 2.2(g) to bring the claim it now asserts because there is no reasonable reading of "accrued," as that term is used in Section 2.2(g) of the sale agreement, that would have retained in NSTAR the right to bring the claim it asserts here. Thus, we need not delve into the particularities of the parties' arguments as to what is the proper reading of "accrued" because the disposition of this case does not require that we settle on a definition of that term at all.[17]

_____

(Mass. 1966), regardless of when the damages are incurred. *Di Gregorio v. Commonwealth*, 407 N.E.2d 1323, 1324 (Mass. App. Ct. 1980).

[16] In its reply in support of its cross-motion for partial summary judgment, NSTAR briefly argues that the last antecedent rule requires us to read "accrued" as modifying "[DOE]'s defaults," not "claims." The last antecedent rule is more of a guideline than an absolute rule, *Richardson v. United States*, 110 F.4th 1375, 1382 (Fed. Cir. 2024) (citation omitted), and we think "that doctrine provides only marginal assistance" here. *Res. Conservation Grp., LLC v. United States*, 597 F.3d 1238, 1245 (Fed. Cir. 2010). It seems clear to us that throughout the decades-long saga of litigation between NSTAR, Holtec, and the government, the parties, and this court, have consistently understood Section 2.2(g)'s use of the term "accrued" as modifying what "claims" would be retained. Because that interpretation is consistent with a natural reading of Section 2.2(g), we decline to depart from it today.

[17] Although we agree with the government and Holtec that "accrued" plainly means "actionable," it is unnecessary to reach that conclusion here because, as we explain below, NSTAR's present claim cannot, as a matter of law, have

This brings us to what we view as Judge Lettow's clearly erroneous prior decisions. In *Boston Edison VIII*, this court held that NSTAR "expressly retained the rights" to the claim it asserts in its complaint through "the assignment's reservation language." *Boston Edison VIII*, 152 Fed. Cl. at 363 (citing *Boston Edison VII*, 106 Fed. Cl. at 340). And in *Boston Edison IX*, this court further doubled down, explaining that "[t]he use of the word 'accrued' in the contract for sale of Pilgrim should not be read so as to foreclose [NSTAR] from asserting a claim for decommissioning costs in the future." *Boston Edison IX*, 156 Fed. Cl. at 637 (quoting *Boston Edison VII*, 106 Fed. Cl. at 340). Critically, this court's decisions in both *Boston Edison VIII* and *IX* relied on and reaffirmed what we view to be *Boston Edison VII*'s clearly erroneous view of the Federal Circuit's holding in *Boston Edison VI* and its impact on the validity and nature of the claim NSTAR now brings.

The *Boston Edison VII* decision rested on an understanding that the "Federal Circuit applied principles of partial breach to establish that [NSTAR] has suffered an injury springing from the government's pre-transfer breach. Rights flowing from that injury remain [NSTAR]'s because DOE defaulted before the transfer of the Pilgrim plant to [Holtec]." *Boston Edison VII*, 106 Fed. Cl. at 341 (interpreting *Boston Edison VI*). That understanding, however, was plainly wrong. The focus in *Boston Edison VI* was the issue of the recoverability of "'prospective damages for *anticipated future nonperformance*' . . . in a partial breach case." *Boston Edison VI*, 658 F.3d at 1367 (emphasis added) (quoting *Indiana Michigan*, 422 F.3d at 1376). The Federal Circuit held that regardless of whether NSTAR "actually suffered losses associated with DOE's breach of contract when it sold Pilgrim," NSTAR cannot

> recover damages equal to the payment of estimated future breach-related costs to [Holtec because to do so] would undermine the prohibition on recovery of future damages in cases in which DOE has breached the Standard Contract. Owners of nuclear power generation facilities cannot skirt that restriction by paying buyers for the estimated value of damages expected to be caused by *DOE's future breach*, and then suing the government to recover the prepayment before any such breach-related expenses are incurred. Put another way, the estimated value of future damages agreed upon by two private parties should not set the amount of the government's liability

---

been in existence in any form as of the 1999 closing.

> for partial breach. While the figure chosen by [NSTAR] and
> [Holtec] may turn out to be an accurate estimate of the harm
> caused by DOE *if the agency continues to delay performance*,
> that figure could also prove to be excessive.

*Id.* at 1367 (emphasis added). Fundamentally, the Federal Circuit
categorically rejected NSTAR's diminution-in-value theory and only left the
door open for a suit to recover post-decommissioning damages when *and if*
they are caused by a potential *future* breach. Only then would the issue of
who owned the right to claim that breach have to be separately addressed.
However, nothing in the Federal Circuit's ruling supports the assumption that
NSTAR owned that future claim or that a claim accrued (for purposes of the
sale agreement) in 1999 and continued in some inchoate state (for purposes
of the applicable statute of limitations) until decommissioning would begin.

     Contrary to what this court has previously said, the Federal Circuit did
not "recast [NSTAR]'s claim." *Boston Edison VII*, 106 Fed. Cl. at 340. Nor
did the Federal Circuit find that NSTAR itself "has a nascent claim for
decommissioning costs." *Id.* at 337. Rather, the Federal Circuit flatly rejected
NSTAR's claim for diminution-in-value resulting from the 1998 breach and
merely clarified the nature of the claim that could potentially be brought in
the future by *a* party to recover any damages caused by DOE's anticipated
future nonperformance. This reading of *Boston Edison VI* is bolstered by the
fact that the Federal Circuit specifically stated that it was "not decid[ing] the
respective rights of [NSTAR] and [Holtec] relating to any partial or total
*breach of contract* by DOE *that postdates the decommissioning* of the
Pilgrim facility." *Boston Edison VI*, 658 F.3d at 1367 n.4 (emphasis added).
Thus, the claim for post-decommissioning SNF-related costs that the Federal
Circuit recognized might be brought in the future was inherently and
necessarily tied to a *future* breach, *not the original 1998 breach*.[18] Thus, such
a claim did not exist as of the July 1999 closing.

     This is an important distinction because NSTAR is now trying to bring
that exact claim and is seeking to recover post-decommissioning SNF storage

---

[18] This is consistent with the nature of the rule barring recovery of damages
for future nonperformance. As the Federal Circuit stated in *Indiana
Michigan*, "if the breach of an entire contract is only partial, the plaintiff can
recover only such damages as he or she has sustained, *leaving prospective
damages to a later suit in the event of further breaches*." *Indiana Michigan*,
422 F.3d at 1377 (citation omitted).

costs incurred by Holtec. Critically, NSTAR frames its current claim for post-decommissioning SNF storage costs as one based on DOE's original 1998 breach (as it must to plausibly bring the claim within the reach of Section 2.2(g)). *See* Second Am. Compl. 12, ECF No. 118. Indeed, Judge Lettow previously explicitly said that "the foundational elements of [NSTAR's present] cause of action for breach of contract were established when DOE first breached the contract." *Boston Edison VII*, 106 Fed. Cl. at 341 (citing *Boston Edison VI*, 658 F.3d at 1367). But, under *Boston Edison VI*, a claim for Pilgrim's post-decommissioning SNF storage costs is inherently not a claim founded upon DOE's original failure to pick up SNF from Pilgrim in 1998. In other words, NSTAR is now bringing a claim on a "breach of contract by DOE that postdates the decommissioning of the Pilgrim facility." *Boston Edison VI*, 658 F.3d at 1367 n.4. Therefore, a claim to recover Pilgrim's post-decommissioning SNF storage costs is not and cannot be a claim based on the original 1998 breach.

Recall that, under Judge Lettow's view, NSTAR's claim was viable because it "accrued" (for purposes of the sale agreement) by the 1999 closing date and yet remained inchoate, i.e., not actionable, until Holtec began decommissioning Pilgrim and incurring post-decommissioning SNF storage costs (clearing the statute of limitations hurdle). But for this to be so, NSTAR must have a viable claim for post-decommissioning SNF storage costs that is founded on DOE's original 1998 breach. *See Boston Edison VII*, 106 Fed. Cl. at 341. As we have just explained, and as dictated by Federal Circuit precedent, no such claim could have existed as of the July 1999 closing.

Thus, it is apparent to us that this court clearly erred in *Boston Edison VII* in concluding that, based on the Federal Circuit's decision in *Boston Edison VI*, NSTAR's claim for post-decommissioning SNF storage costs was a claim based on DOE's original 1998 breach and that it was retained by NSTAR. *See id.* (citing *Boston Edison VI*, 658 F.3d at 1367). This fundamental misconception (that NSTAR is able to recover post-decommissioning SNF storage costs in a suit based on DOE's 1998 breach) led this court to a clearly incorrect conclusion that NSTAR retained a claim under Section 2.2(g) of the sale agreement for post-decommissioning SNF storage costs. Furthermore, this clear error served as the foundation for, and was reaffirmed by, this court's decisions in *Boston Edison VIII* and *IX*. And critically, it is this exact error upon which the validity of NSTAR's present claim and its arguments against the government's and Holtec's motions now rests.

Having now a proper understanding of the nature of a valid claim for Pilgrim's post-decommissioning SNF storage costs, we return to the parties' arguments. The government and Holtec argue that "accrued," as that term is used in Section 2.2(g), should be interpreted in accordance with *Indiana Michigan* and *Corner Post* (requiring a presently actionable claim). While devoting most of its arguments on brief to opposing the government's and Holtec's proposed interpretation of "accrued," NSTAR, for its part, has yet to endorse a singular definition of that word and, instead, repeatedly stresses that the "only reasonable interpretation" of Section 2.2(g) as a whole "is that NSTAR retained the claim it now asserts." However, for the sake of completeness, we will credit NSTAR's reliance on its understanding of the underlying Massachusetts law and its defense of this court's previous decisions as advocating for a definition of "accrued" that only requires the relevant breach to have occurred. *See Boston Edison IX*, 156 Fed. Cl. at 638 (quoting *Boston Edison VII*, 106 Fed. Cl. at 341) (holding that NSTAR's "decommissioning claims accrued before the sale to [Holtec] in 1999 because 'the foundational elements of [NSTAR]'s cause of action for breach of contract were established when DOE first breached the contract'"). While the parties would certainly disagree as to which interpretation is correct, the disposition of this case does not depend on us making that determination because, either way, the conclusion is still the same: NSTAR has no right under Section 2.2(g) of the sale agreement to bring the claim it now asserts. In fact, we are unaware of any reasonable reading of the word "accrued" that would encompass NSTAR's present claim when neither the breach nor damages giving rise to that claim had occurred as of the July 1999 closing.

Read properly, the combined effect of *Indiana Michigan* and *Boston Edison VI* is that a claim for Pilgrim's post-decommissioning SNF storage costs could only be brought when *and if* such costs were caused by a potential *future* breach—not the original 1998 breach. While we now know that both the required "future breach" and damages flowing from it have happened, it is indisputable that neither of those events had happened as of the 1999 closing. Therefore, whether the parties intended "accrued" to carry the *Corner Post* and *Indiana Michigan* meanings (requiring NSTAR to have a complete and present cause of action) or the meaning derived from NSTAR's understanding of the underlying Massachusetts law and this court's prior decisions (requiring only the relevant breach to have occurred),[19] we hold

---

[19] It is worth noting that this court effectively previously construed "accrued" in Section 2.2(g) consistently with NSTAR's view of Massachusetts law. *Boston Edison VII*, 106 Fed. Cl. at 341 (holding that "the foundational

that NSTAR's current claim was not and could not have been retained under Section 2.2(g) because the claim did not exist as of the July 1999 closing, and, thus, NSTAR has no right to the post-decommissioning SNF storage costs it now seeks in this court.

NSTAR asserts that it is absurd to read Section 2.2(g) in such a way that NSTAR retained nothing under Section 2.2(g) because such a reading would render the phrase "whether relating to periods prior to or following the Closing Date" meaningless. This argument is unpersuasive for at least two reasons. First, our holding is simply that there is no reasonable reading of "accrued," as that term is used in Section 2.2(g), that would retain in NSTAR the right to bring the claim it now asserts because that claim did not exist when the sale of Pilgrim closed in July 1999.[20] And as the government

_____

elements of [NSTAR]'s cause of action for breach of contract were established when DOE first breached the contract" such that NSTAR's "claim for decommissioning costs is extant, but it will fully mature only when particular mitigating costs are expended at and on decommissioning"). Under Judge Lettow's understanding of the nature of a proper claim for Pilgrim's post-decommissioning SNF storage costs, reading "accrued" as only requiring the relevant breach to have occurred (as opposed to needing the claim to be presently actionable) allowed NSTAR to bring the claim it now asserts because the claim would have "accrued" for purposes of the sale agreement when the relevant breach occurred (DOE's original 1998 breach) and yet "accrued" for purposes of the applicable statute of limitations on May 31, 2019.  We do not here express an opinion as to whether it is reasonable to interpret "accrued," as that term is used in Section 2.2(g), as requiring only the relevant breach to have occurred. We find that it was this court's legal error regarding the effect of *Indiana Michigan* and *Boston Edison VI* on the nature of a proper claim for Pilgrim's post-decommissioning SNF storage costs, not necessarily an error in contract interpretation, that led it to the erroneous conclusion that NSTAR retained the claim it now asserts.

[20] Importantly, Section 2.1(h) of the sale agreement makes clear that NSTAR transferred "all right, title and interest . . . in the Decommissioning Trust and the Provisional Trust (if any)." Moreover, Section 2.7 specifically states that the parties "intend and expect [Holtec]'s assumption of the Pilgrim decommissioning liabilities pursuant to Section 2.3(e) will constitute purchase price paid for [NSTAR]'s right, title and interest in the Decommissioning Trust and the Provisional Trust." Thus, the sale agreement is unequivocally clear that NSTAR no longer has *any* interest in the decommissioning fund as such. Therefore, any claim NSTAR may have for

and Holtec point out, the sale agreement itself contemplates the possibility that nothing would be retained under Section 2.2(g). The opening paragraph of Section 2.2 (titled "Excluded Assets") states that NSTAR would retain "any and all right, title or interest to the following assets, properties and rights" but only "to the extent in existence on the Effective Date or on the Closing Date." Thus, the very terms of the sale agreement recognize that Section 2.2(g)'s reach is limited to those claims that existed on the Effective Date or on the Closing Date. Because we hold here that NSTAR had no accrued claim (for purposes of the sale agreement) for post-decommissioning SNF storage costs in existence at that time, the sale agreement dictates that NSTAR has no right to assert such a claim now.

Second, it was post-contracting events, namely the Federal Circuit's decision in *Boston Edison VI*, that dictate that NSTAR retained nothing.[21] From the perspective of the parties *at the time of contracting*, NSTAR possibly retained a potential claim. Most importantly, this included NSTAR's diminution-in-value claim. NSTAR's diminution-in-value theory fits the contract language perfectly. Under that theory, NSTAR's claim accrued as of the closing date because DOE's 1998 breach forced NSTAR to overfund the decommissioning trust fund to cover anticipated post-decommissioning SNF storage costs, which arguably diminished NSTAR's value. And while that claim would have "accrued" before closing, it inherently "related to" a period following the closing date (decommissioning). The fact that later events, i.e., the Federal Circuit's decision in *Boston Edison VI*, rendered such a claim not legally viable does not, and cannot, retroactively cause Section 2.2(g) to retain in NSTAR the right to bring the claim it now asserts. Additionally, while seemingly attempting to ensure that the language, "whether relating to periods prior to or following the Closing Date," is not rendered meaningless, NSTAR would have us essentially read "accrued" out of the sale agreement entirely. We decline to do so.

---

funds spent from the decommissioning fund on post-decommissioning SNF storage must find their origin in Section 2.2(g).

[21] The *Boston Edison VI* decision relied on the circuit's earlier *Indiana Michigan* holding that DOE's failure to pick up SNF was a partial breach and not an anticipatory repudiation. *Boston Edison VI*, 658 F.3d at 1366 (citing *Indiana Michigan*, 422 F.3d at 1374).

Therefore, because *Indiana Michigan* and *Boston Edison VI* dictate the conclusion that NSTAR has no right to bring the claim it now asserts, summary judgment in favor of the government and Holtec is proper.

## CONCLUSION

For the reasons set out previously, we grant Holtec's and the government's summary judgment motions against NSTAR and deny NSTAR's cross-motion for partial summary judgment. The Clerk of Court is directed to enter judgment accordingly. The clerk's office is directed to unconsolidate NSTAR Electric Company, Case No. 20-529, and Holtec Pilgrim, LLC, Case No. 22-771, and file a copy of this opinion in Case No. 22-771. The government shall refile in Case No. 22-771 its Second Motion for Court Order Permitting Unrepresented Deposition (ECF No. 240) and all future filings shall be made in that case. Case No. 20-529 is hereby dismissed. No costs.

s/Eric G. Bruggink
ERIC G. BRUGGINK
Senior Judge